**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SAMPSON DUAH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.  15 C 1205 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| ABM PARKING SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Before the Court are defendant's motion for summary judgment and plaintiff's motion to withdraw his request to voluntarily dismiss his ADEA claim.  For the reasons explained below, the motions are granted.

**BACKGROUND**

Plaintiff, Sampson Duah, brought this employment discrimination action against his employer, ABM Parking Services, Inc. ("ABM").   He asserts the following claims: unlawful race and national-origin discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (Counts I, III, and V); unlawful race discrimination in violation of 42 U.S.C. § 1981 (Count II); and violation of the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. §§ 621 *et seq.* (Count IV).[1]  (ECF No. 1, V. Compl.)  ABM moves for summary judgment.

---

[1]Plaintiff also brought a claim for intentional infliction of emotional distress, which he moves to voluntarily dismiss in response to defendant's motion for summary judgment.  (ECF No. 47, Pl.'s Resp. at 1.)  That motion is granted.  Because Federal Rule of Civil Procedure 41(a) provides that a plaintiff may dismiss a claim after the opposing party serves a motion for summary judgment only "on terms that the court considers proper," the dismissal will be with prejudice.

**DISCUSSION**

A.     **Legal Standards**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must construe the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014); *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 499-500 (7th Cir. 2008). A factual dispute is "genuine" only if a reasonable jury could find for either party. *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014). Rule 56 imposes the initial burden on the movant to inform the court why a trial is not necessary. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where the nonmovant bears the ultimate burden of persuasion on a particular issue, the movant's initial burden may be discharged by pointing out to the court that there is an absence of evidence to support the nonmoving party's case. *Id.* Upon such a showing, the nonmovant must then "make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (internal quotation marks and citation omitted). The nonmovant need not depose his own witnesses or produce evidence in a form that would be admissible at trial, but he must go beyond the pleadings to demonstrate that there is evidence upon which a jury could find in his favor. *Id.* at 1168-69 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

Local Rule 56.1 requires the party moving for summary judgment to submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." L.R. 56.1(a)(3). It requires the party opposing the motion to respond to each fact asserted in the movant's statement and, in the case

of any disagreement, include "specific references to the affidavits, parts of the record, and other supporting materials" upon which the opposing party relies. L.R. 56.1(b)(3)(B). If the nonmovant fails to follow the dictates of the Local Rule, he is deemed to have admitted the facts asserted by the movant. *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015) ("'When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion.'") (quoting *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009)). The district court may rigorously enforce Local Rule 56.1. *See Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). The rule "is designed, in part, to aid the district court, which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information, in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (internal quotation marks omitted).

Plaintiff has not complied with the requirements of Local Rule 56.1. In his response to defendant's statement of material facts, he fails to support any of his denials with specific references to the affidavits, parts of the record, or other supporting materials on which he relies.[2] (ECF No. 53, Pl's L.R. 56.1 Resp., ¶¶ 6, 7, 10, 11, 13-22, 24-29, 31-40, 43-46, 48-60, 62-65, 69-72, 74-77, 79, 81-86, 89-91, 93-96, 98, 99, 101, 102, 104, 113, 115-118.) In several instances, he states that he has insufficient information to either admit or deny, which is an improper response that constitutes an admission. (*Id.* ¶¶ 2, 8, 9, 12, 23, 66-68, 87, 88, 92.) *See McGuire v. United Parcel Serv.*, 152 F.3d 673, 675 (7th Cir. 1998). Accordingly, the Court deems

_____

[2]Plaintiff also failed to file a separate statement of additional material facts, as Local Rule 56.1 envisions.

3

plaintiff to have admitted all of the facts set out in defendant's statement. *See Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000) (stating that the "consequence for noncompliance" with Local Rule 56.1 is that "the movants' assertions of material fact are deemed admitted . . . regardless of what contrary evidence is in the record"); *Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001) ("[A] lawsuit is not a game of hunt the peanut. Employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes.") (internal quotation marks and ellipsis omitted).

**B.     Undisputed Facts**

Because plaintiff has conceded ABM's version of the facts, the Court's recitation is drawn primarily from ABM's fact statement.

**1.     Plaintiff's Employment and Job Title**

Plaintiff is a 68-year-old black man who was born in Ghana. In February 1999, he began his full-time employment in the parking industry with System Parking, Inc., which was acquired by L&R Group of Companies ("L&R") on March 4, 2008 and then by ABM on November 1, 2010. When plaintiff was employed by System Parking, his job title was "auditor" (except during a brief training period). He spent the large part of his workday visiting parking facilities, checking the pay machines or boxes to ensure that customers had paid for parking, and issuing parking violations in the event they had not paid. Plaintiff also uploaded the parking violations into a master database and processed payments for parking violations. Before the acquisitions of System Parking, plaintiff also performed various other job duties from time to time, such as training co-workers and conducting "rate surveys" of other parking lots near System Parking facilities where he was checking payments.

4

On February 4, 2009, plaintiff filed charges with the EEOC and Illinois Department of Human Rights ("IDHR") in which he complained that System Parking had discriminated against him on the basis of age and/or national origin by delaying his approval to become a union member,[3] denying him the use of office space with a computer, and taking away his title of "auditor." After System Parking's president told plaintiff that he could keep the job title, plaintiff decided not to file suit. His primary job duties remained unchanged.

After ABM acquired System Parking in November 2010, plaintiff's primary job duties remained the same: he still checked ABM's parking lots to ensure that customers paid for parking and issued parking violations. At the time of the acquisition, System Parking provided ABM with information about its employees and their job titles. System Parking informed ABM that plaintiff's job title was "auditor," and plaintiff's title remained "auditor" despite the fact that it did not jibe with ABM's definition of "auditor." The title means different things at different companies in the parking industry and has evolved over the years. A System Parking "auditor" performs mainly the same duties as an ABM "lot checker." Plaintiff was performing the same duties as ABM "lot checkers" Demetrius Ewing, Abdul Raja Jimjimo, Marvis Hiner, and Christopher Petty, all or most of whom are African-American.

Plaintiff performed less than ten percent of the duties performed by an ABM "auditor." An ABM "auditor" completes daily audits; maintains and files audit reports; reviews and reports errors in financial entries, documents, and reports; documents and discusses with management any weaknesses in operating procedures and internal controls; acts as a liaison with ABM corporate employees regarding internal control issues; and assists in preparing for audits. ABM

---

[3]Duah was complaining strictly about the delay; he noted in his charge that he had eventually obtained union membership.

"auditors" use a software program called Business Intelligence to obtain their data to perform audits. To qualify for employment as an "auditor" at ABM, one must have, among other things, a bachelor's degree in accounting or finance. Plaintiff does not have a bachelor's degree. He does not have access to, or know how to use, the Business Intelligence program, nor is he familiar with regulatory audit requirements.

In February 2013, ABM posted a position for "audit clerk." Although the position did not require a college degree, it was managerial and required the use of computer spreadsheets. The duties of the position included completing daily audits, assisting accountants, and maintaining filing and storage of audit reports. The position did not have any duties that overlapped with plaintiff's. Pursuant to ABM's routine practice, it posted the position for audit clerk by sending an email to personnel at its area locations to be posted on communal bulletin boards and by creating postings on www.abm.com/jobs and monster.com. It is ABM's practice to require individuals to complete an application for a job if they wish to be considered for it. Plaintiff did not apply for the "audit clerk" position and says that he did not see the posting.

ABM also began restructuring its Audit Department in February 2013. At that time, ABM reviewed plaintiff's duties and discovered that his "auditor" title did not correspond with the "lot checker" duties that he was actually performing. In April 2013, plaintiff filed charges with the EEOC and IDHR in which he alleged that ABM had discriminated against him on the basis of his race and national origin. He complained that he had been informed that ABM wanted to move him from the Audit Department to the Midnight Operations Department; he was not given the same "terms and conditions" as "co-workers who were similarly situated"; a position of "audit supervisor" had been created and filled without having been posted; and his cell-phone privileges had been cut off in retaliation for having opposed alleged race and national

6

origin discrimination. Plaintiff includes these allegations in the current complaint. ABM refrained from changing plaintiff's title to the proper title of "lot checker" given the pendency of the charges. Plaintiff had knee-replacement surgery and then took leave under the Family and Medical Leave Act from June 24, 2013 through August 26, 2013.

On August 29, 2013, ABM withdrew the "audit clerk" posting without hiring anyone for it, and posted a position for "auditor." This posting, like the previous one, was emailed to ABM personnel for printing and posting on bulletin boards and was posted online on ABM's website and monster.com. The "auditor" position was managerial and required a bachelor's degree in accounting or finance. Like the "audit clerk" position, the "auditor" position did not entail duties that overlapped with plaintiff's. Plaintiff did not apply for the "audit clerk" position. In September 2013, ABM hired Katreina York, a former ABM employee, for the position.

In October 2013, Matthew Andrews became the general manager of ABM's parking properties in the City of Chicago and some suburbs. He began looking for ways to cut costs. In June 2014, Eric Koprowski, an ABM operations manager, determined that the cost of using lot checkers was six times the amount of revenue the lot checkers brought in by issuing violation tickets. Because ABM valued the lot checkers as employees, it determined that it would create a new unit called Emergency Services, which would assist customers who encountered various issues, such as malfunctioning equipment, having locked their keys in their car, or having their cars blocked. ABM had existing employees to address those issues from 7 a.m. to 3 p.m., so it was determined that Emergency Services employees would be used during other shifts. By creating the new unit, ABM cut costs and was able to keep the lot checkers as employees, using them at twenty-five to thirty locations instead of the nine locations to which they had previously been assigned.

7

On November 12, 2014, Koprowski had a meeting with plaintiff; Caleen Carter-Patton, plaintiff's union representative; and Rhonda Evans (now Rhonda Spicer), an ABM human resources manager. During the meeting, Koprowski informed plaintiff about the new Emergency Services unit, explained why it was created, and told plaintiff that he would be moved to the unit. At the time, plaintiff was the only employee performing lot-checking duties during the day. Because of his seniority, plaintiff was given first pick of his new shift, and he chose the 3:00 p.m. to 11:00 p.m. shift. Later in the month of November 2014, plaintiff filed charges with the EEOC and IDHR in which he alleged that ABM had discriminated against him on the basis of his race, national origin, and age.

Plaintiff and the other lot checkers were moved to Emergency Services on January 1, 2015, and plaintiff's job title changed from "auditor" to "Emergency Services." ABM also began paying plaintiff on an hourly basis instead of a salaried basis, but plaintiff did not suffer a decrease in pay or benefits; he actually received a two percent discretionary raise that the other lot checkers did not receive. Plaintiff also became eligible for overtime pay, holiday pay, and a guaranteed annual raise, and, in November 2015, a raise of fifty-five cents per hour. After plaintiff moved to Emergency Services, ABM did not hire replacements for him or any of the other lot checkers. Indeed, ABM no longer employed anyone who focused on issuing tickets to parking violators during the day shift.

### 2. Plaintiff's Cell Phone Service

Prior to L&R's acquisition, System Parking provided plaintiff and certain other employees with a work cell phone and paid for the service. After the acquisition by L&R, and after the acquisition by ABM, System Parking reimbursed plaintiff and certain other employees for their cell-phone service if they used their personal phone for work purposes. In September,

October, and December 2012, plaintiff was not reimbursed for his phone service, but eventually was after pursuing the matter with his union representative and human resources. As of January 1, 2013, however, ABM decided to stop paying for plaintiff's cell-phone service, because he did not use the phone for work purposes any more than two or three times per week. Later that year, on August 25, 2013, ABM issued plaintiff a cell phone for work use.

## C. Analysis

### 1. Race and National Origin Discrimination

Counts I and III are race and national origin discrimination claims for violation of Title VII. Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Count II is a claim for race discrimination in violation of 42 U.S.C. § 1981. The same requirements for proving discrimination apply to claims under Title VII and § 1981. *Egonmwan v. Cook Cty. Sheriff's Dep't*, 602 F.3d 845, 850 n.7 (7th Cir. 2010).

To avoid summary judgment on these claims, Duah must show that a reasonable jury could find that ABM unlawfully discriminated against him on the basis of his race or national origin. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). He must point to enough "evidence [that] would permit a reasonable factfinder to conclude that the plaintiff's race . . . or other proscribed factor caused the . . . adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself . . . . " *Ortiz v. Werner Enters., Inc.*, --- F.3d ----, 2016 WL 4411434, at *4 (7th Cir. Aug. 19, 2016). Plaintiff can also attempt to use the *McDonnell Douglas* burden-shifting framework by demonstrating that (1) he is a member of a protected class; (2) his job

performance met ABM's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly-situated individual outside his protected class was treated more favorably. *See Egonmwan*, 602 F.3d at 850. If Duah can make out this prima facie case, the burden shifts to ABM to provide legitimate, nondiscriminatory reasons for its actions, and if it does so, the burden shifts back to Duah to offer evidence that ABM's reasons were merely pretextual. *See id.*

ABM first asserts that plaintiff has failed to demonstrate that he was subjected to an adverse employment action. In order to survive summary judgment, Duah must demonstrate a materially adverse employment action that resulted from the alleged discrimination. *See Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 730 (7th Cir. 2009). "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009); *see also O'Neal v. City of Chi.*, 392 F.3d 909, 911-12 (7th Cir. 2004). Although the definition of an adverse employment action is generous, an employee must show some quantitative or qualitative change in the terms or conditions of his employment or some sort of real harm. *Nagle*, 554 F.3d at 1116-17. Duah identifies the following as adverse employment actions resulting from ABM's alleged discrimination: (1) ABM did not promote him to the position of "audit supervisor"; (2) ABM did not advertise the position of "audit supervisor" as required by its policy; and (3) ABM transferred him from being an "auditor" in the Audit Department to being a "lot checker" in the newly-created Emergency Services unit. (Pl.'s Resp. at 2.)

10

As for the first two actions, there is no competent evidence that supports plaintiff's contention that ABM created an "audit supervisor" position. ABM has submitted the affidavit of Rhonda Spicer, who states that the only two positions in the Audit Department that were posted during the relevant period were "audit clerk" and "auditor." Although there is evidence that Ryan Quinn, an area manager in ABM's Operations Department, performed some supervisory auditing duties on an interim basis in 2013, there is no evidence that ABM created an "audit supervisor" position or posted such a job opening. Plaintiff has submitted an affidavit in which he refers to this position, but the affidavit is insufficient to rebut defendant's evidence. Plaintiff's contentions about the purported position are conclusory and unsupported by any specific facts or evidence. Furthermore, as ABM points out, plaintiff offers no facts from which it could be concluded that he had personal knowledge of human-resources decisions or Ryan Quinn's job title. A plaintiff's conclusory statements in an affidavit, unsupported by the evidence of record, do not suffice to avoid summary judgment. *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 429 (7th Cir. 2004). ABM is therefore entitled to summary judgment on Duah's claims related to the purported "audit supervisor" position.[4]

---

[4]Even if plaintiff had pointed to evidence that the position existed, summary judgment in favor of ABM would still be appropriate given that the evidence does not permit an inference that plaintiff's race or national origin caused any action, and plaintiff admitted he never submitted an application for any position that would have constituted a promotion. *See Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 728 (7th Cir. 2013) ("The prima facie case for a failure to promote claim requires that the plaintiff show [he] applied for and was qualified for the position sought and [he] was rejected for that position.") (internal brackets, ellipses, and quotation marks omitted); *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 558-59 (7th Cir. 2004) (affirming summary judgment for employer where employee did not apply for the position at issue).

11

This leaves plaintiff's transfer to Emergency Services and new job title of "lot checker." ABM asserts that these actions were not materially adverse, while plaintiff contends that they constituted a demotion. The Seventh Circuit has articulated "three general categories of materially adverse employment actions actionable under Title VII": (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects; and (3) cases in which the conditions in which the employee works are changed in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in the workplace environment. *O'Neal*, 392 F.3d at 911.

Plaintiff concedes that he received the same salary and benefits in Emergency Services that he received as an "auditor." (Pl.'s Resp. at 2, 14.) It is undisputed that as a result of the changes, plaintiff also became eligible for overtime and holiday pay and a guaranteed annual raise. Plaintiff does not argue or cite any evidence that the transfer and/or new job title reduced his career prospects or that the skill requirements of his job were altered in ways that were humiliating, degrading, unsafe, or unhealthy. Furthermore, there is no evidence that plaintiff's job duties were diminished. Plaintiff admits that before the transfer, he visited parking lots and garages on a daily basis to verify that customers were paying for parking and to issue tickets if they had not paid. Even though his title was "auditor" (an artifact from System Parking), he checked parking lots and performed the same duties as other employees who were called "lot

checkers."[5]  After plaintiff's transfer, his primary duties shifted to assisting customers who were having trouble with malfunctioning machines, locked cars, or entering the parking facility.  But he still visited parking facilities on a daily basis, and he admitted at his deposition that he still was expected to check for valid parking tickets at some facilities.

A purely lateral transfer that involves no reduction in pay and no more than a minor change in working conditions is not a materially adverse employment action.  *O'Neal*, 392 F.3d at 911-12.  Similarly, the loss of a job title, when similar responsibilities and identical salary and benefits are retained, does not constitute an adverse employment action.  *Grayson v. City of Chi.*, 317 F.3d 745, 750 (7th Cir. 2003).  Plaintiff fails to present sufficient evidence of an adverse employment action; the most he can show is a lateral transfer without any change in pay or benefits.  The focus of plaintiff's daily duties was different, but he does not explain, and it is not evident to the Court, how his responsibilities were significantly diminished or how the new position was *objectively* inferior.[6]  All that plaintiff offers in support of his argument that the transfer and new job title were materially adverse actions are his subjective beliefs.  But "a transfer does not become an adverse employment action solely because the employee subjectively prefers one position over another."  *McKenzie v. Milwaukee Cty.*, 381 F.3d 619, 625-26 (7th Cir. 2004) (citing *Herrnreiter v. Chi. Housing Auth.*, 315 F.3d 742, 745 (7th Cir. 2002)).  Moreover, even if plaintiff could identify an adverse employment action, he fails to

_____

[5]Plaintiff claims that because he was able to detect fraud, he performed his job better than others who were checking parking lots, but his performance is a separate issue from his duties.

[6]Although plaintiff does not discuss the change in his work schedule, the Court also notes that a change of shift without any reduction of status or pay is not a materially adverse employment action.  *See, e.g.*, *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 728 (7th Cir. 2001).

submit or point to any evidence that would permit a reasonable factfinder to conclude that his race or national origin caused ABM to take any action, nor does he present evidence of any similarly-situated individual outside his protected class who was treated more favorably.

Accordingly, defendant's motion for summary judgment is granted as to plaintiff's claims for race and national origin discrimination.

### 2. Retaliation

Count V is a claim for retaliation in violation of Title VII. "In the context of laws governing employment rights, 'unlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination.'" *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012) (quoting *Rogers v. City of Chi.*, 320 F.3d 748, 753 (7th Cir. 2003)). To establish Title VII retaliation, Duah must show that after he engaged in statutorily-protected activity, he suffered a materially adverse employment action, and ABM's desire to retaliate was the but-for cause of the adverse action. *See Carothers v. Cty. of Cook*, 808 F.3d 1140, 1152 (7th Cir. 2015); *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 734-35 (7th Cir. 2001). To invoke burden-shifting as to causation, plaintiff can show that he met ABM's legitimate expectations and was treated less favorably than similarly-situated co-workers who did not engage in protected activity. *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 309 (7th Cir. 2012). "An employee engages in a protected activity by either: (1) filing a charge, testifying, assisting or participating in any manner in an investigation, proceeding or hearing under Title VII or other employment statutes; or (2) opposing an unlawful employment practice. Vague and obscure 'complaints' do not constitute protected activity." *Northington v. H & M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013).

14

Plaintiff alleges that ABM "retaliated against him for having opposed race and national origin discrimination by initially refusing to pay his cellular phone bill incurred in his job performance and, subsequently, by cutting off his cellular phone privileges." (V. Compl. ¶ 223.) The complaint does not specifically identify the protected activity in which Duah engaged that allegedly led to the delay in reimbursement for his phone service and cessation of his cell-phone privileges. The reimbursement delay and phone cutoff occurred in the fall and winter of 2012. ABM focuses on the timing of plaintiff's 2013 EEOC charge and asserts that because Duah "cannot identify a single complaint about alleged harassment or discrimination he made prior to" ABM's determination that it would no longer reimburse him for phone service, his retaliation claim fails. (ECF No. 32, Def.'s Am. Mem. at 5.) In response, plaintiff again fails to identify the specific protected activity for which he was allegedly retaliated against. He merely continues to assert, vaguely, that ABM retaliated against him "when he opposed the discrimination against him in the workplace." (Pl.'s Resp. at 23-25.)

"It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered." *Domka v. Portage Cty.*, 523 F.3d 776, 783 (7th Cir. 2008). Plaintiff has failed to do so. The Court can identify only one instance of protected activity in which plaintiff engaged prior to the reimbursement delay and cessation of his cell-phone service: his filing of EEOC and IDHR charges against System Parking in February 2009, well before ABM's acquisition of System Parking. And even if plaintiff had pointed to the 2009 protected activity in an attempt to meet his burden on summary judgment, it would have been futile. "The inference of causation weakens as the time between the protected expression and the adverse action increases, and then

15

additional proof of a causal nexus is necessary." *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 616 (7th Cir. 2001) (internal quotation marks omitted). The Seventh Circuit has "permitted retaliation charges to proceed in the face of long intervals only when additional circumstances demonstrate that an employer's acts might not be legitimate." *Id.* There is nearly a four-year interval between plaintiff's protected activity and the alleged retaliation, and plaintiff does not rely on any circumstantial evidence in the record to support his retaliation claim. His argument is entirely conclusory. Accordingly, the Court grants defendant's motion for summary judgment on plaintiff's retaliation claim.

### 3.    Age Discrimination

In his response to defendant's motion, Duah moved to voluntarily dismiss his ADEA claim (Count VI, which is mislabeled as a duplicative "Count V" in the complaint). Shortly after filing his response, however, Duah filed a motion to withdraw his request for voluntary dismissal of this claim. He explains that he "erroneously thought that Ryan Quinn who replaced him was over forty (40) years of age and that was the basis why" he moved for voluntary dismissal. (ECF No. 49, Pl.'s Mot. to Withdraw at 2.) He further argues that "[t]he fact that [Duah], an ADEA Plaintiff, was replaced by Ryan Quinn outside of the protected class satisfies and is a proper element of the *McDonnell Douglas* prima facie case." (*Id.* at 3.)

Plaintiff's motion to withdraw his voluntary dismissal is granted, and the Court will proceed to consider whether ABM is entitled to summary judgment on plaintiff's ADEA claim. The Court uses "essentially the same analytical framework to employment discrimination cases whether they are brought under the ADEA, Title VII, or § 1981." *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060 n.4 (7th Cir. 2003).

16

Case: 1:15-cv-01205 Document #: 58 Filed: 08/30/16 Page 17 of 18 PageID #:1873

Plaintiff's ADEA theory is puzzling. In his motion to withdraw the voluntary dismissal, he cites *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308 (1996), where the plaintiff was fired and replaced by someone younger. That is not the situation here. At the time the instant motions were briefed, plaintiff was still employed by ABM. There is no evidence that he was replaced by anyone. Alternatively, plaintiff's claim may be premised on the failure to promote him to "audit supervisor."[7] As discussed above, there is no evidence to support plaintiff's contention that this position was even created. In any event, plaintiff's attempt to establish a prima facie case of age discrimination fails. Plaintiff suggests that Ryan Quinn was a similarly-situated co-worker who is thirty years younger than plaintiff and was treated more favorably. Yet plaintiff points to no evidence that Quinn was in fact similarly situated to him, and indeed, the evidence is to the contrary. Quinn only briefly performed the same job as plaintiff, in 1999. At the relevant times, when ABM acquired System Parking in 2010 and thereafter, Quinn was an area manager in the Operations Department. He was responsible for the daily operations of several parking facilities and had budgeting duties and the power to hire and fire. His duties did not at all overlap with plaintiff's. Because plaintiff has not shown that substantially younger and similarly-situated employees were treated more favorably than him, he fails to set out a prima facie case of age discrimination, and summary judgment in favor of ABM is appropriate as to plaintiff's ADEA claim.

---

[7]To the extent that plaintiff may also base his age discrimination claim on the purported adverse employment actions discussed above in section C.1, the Court's holding that plaintiff has failed to establish a materially adverse employment action on his claims for race and national origin discrimination applies equally to his ADEA claim.

## CONCLUSION

Plaintiff's motion to withdraw his request to voluntarily dismiss his ADEA claim [49] is granted. Plaintiff's motion to voluntarily dismiss his claim for intentional infliction of emotional distress is granted, and that claim is dismissed with prejudice. As to the remainder of plaintiff's claims, defendant ABM Parking Services, Inc.'s motion for summary judgment [31] is granted, and judgment will be entered in favor of defendant and against plaintiff. Civil case terminated.

**SO ORDERED.**                    **ENTERED:   August 30, 2016**


_____

**JORGE L. ALONSO**
**United States District Judge**